O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys **NOT** Present for Plaintiffs: | Attorneys **NOT** Present for Defendants: | |

**Proceedings:**     IN CHAMBERS (No Proceedings Held)

    Plaintiff Martha Winkler seeks long term disability benefits from Defendants, The National American Red Cross Long Term Disability Plan, and Aetna Life Insurance Company (collectively, "Defendants"). Defendants lodged the Administrative Record, and this matter is now before the Court on Plaintiff's appeal under ERISA of Defendants' denial of benefits. For the following reasons, the Court finds that Defendants did not abuse their discretion in denying Plaintiff's claim for benefits.

## I.  THE FACTUAL RECORD

    The administrative record shows as follows. Plaintiff, a registered nurse, was employed by the American National Red Cross as a Donor Services Supervisor. (Administrative Record ("AR") at 157.) On January 14, 2004, while driving to work, she suffered a full cardiac arrest (*Id.* 238-240.) She was transported to the emergency room at White Memorial Medical Center, and subsequently transported to the Intensive Care Unit where she remained for several days and had a defibrillator surgically implanted. (*Id.* at 232.)

    Post-hospitalization, Ms. Winkler treated with Dr. Conrad (cardiologist) and Dr. Elghazi (neurologist). Dr. Conrad, who saw Ms. Winkler on February 23, 2004, noted her "atherosclerotic cardiovascular disease with myocardial infarction" on January 14, 2004, but that she had "no occlusive coronary artery disease." (AR at 232-33.) Dr. Elghazi noted that during a visit on May 25, 2004, Ms. Winkler had a "mental status score" of "38/38," normal judgment and insight, and negative results on a CT scan of her head. (*Id.* at 230.) Dr. Elghazi diagnosed her with "mild cognitive impairment,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

subjective." (*Id.*)

### A. Ms. Winkler's Initial Claim for Benefits

On or about August 5, 2004, Ms. Winkler initiated a claim for long term disability ("LTD") benefits with Aetna Life Insurance Company. (*Id.* at 145.) In her application, Ms. Winkler indicated that her condition prevented her from performing her occupation due to "high job stress, difficult to remember and concentrate on job duties and requirements." (*Id.*) Her treating physician, Dr. Ruth Hamad, completed an attending physician's statement on August 2, 2004 and indicated that Ms. Winkler's diagnosis was post myocardial infarction and memory loss. (*Id.* at 147-50.) Dr. Hamad further noted that Ms. Winkler had physical limitations and indicated that "work would be to [sic] stressful on [Ms. Winkler's] heart," that she "would not be able to concentrate," and that she had "marked memory loss." (*Id.* at 150.) The prognosis that Dr. Hamad documented was "good-fair." (*Id.*)

On October 11, 2004, Judith Deville, a disability analyst with Aetna, conducted a telephonic interview with Ms. Winkler. During this call, Ms. Winkler self-reported a number of limitations on her ability to perform her job, including memory loss, cognitive impairment, and problems with commuting in rush hour traffic. (*Id.* at 120-21.)

On October 15, 2004, a triage at Aetna was attended by the team leader, vocational rehabilitation counselor, and nurse consultant to review Ms. Winkler's claim. (AR at 206.) The triage noted that she had been diagnosed with acute myocardial infarction and memory loss. (*Id.* at 116.) They further noted that Ms. Winkler was "to be evaluated at USC," that she was "likely [to] receive some sort of therapy (speech or other) & have neuro eval which would be helpful in understanding [Ms. Winkler's] cognitive functioning." (*Id.*) The triage agreed upon approving the claim. The administrative record shows that an Aetna employee conducted a "vocational rehabilitation review" and recommended that Aetna "obtain all therapy notes for review at next clinical review for possible progress/improvement in cognitive status or use of compensatory strategies that may assist with [return to work] opportunities." (*Id.* at 119.) The reviewer further recommended that Aetna "refer back to rehab for review once this clinical info is received and aware of extent of cognitive deficiencies." (*Id*)

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

**B.     Aetna Approves Ms. Winkler's Initial Claim and Requests Additional Information**.

On January 21, 2005, Aetna notified Ms. Winkler that her claim was approved and that she was eligible to receive LTD benefits, retroactively effective as of July 11, 2004, for up to 18 months as long as she remained disabled from her own occupation. (*Id*. at 210.) Also on January 21, 2005, Aetna sent letters to Ms. Winkler and her three identified treating physicians—Dr. Elghazi (neurology), Dr. Conrad (cardiology), and Dr. Hamad (internal medicine)— requesting updated medical records. (*Id*. at 218-221.) In the letters, Aetna requested the "USC evaluation report, therapy notes, and neuro notes for cognitive status." (*Id*.) The letters stated that Ms. Winkler's "monthly benefits may be terminated if we do not receive documentation within 30 days of the date of this letter." (*Id*.) Dr. Hamad responded to Aenta's request by providing 56 pages of documents to Aetna on February 10, 2005.[1] (*Id.* at 114.) There is nothing in the record showing that Aetna received any additional information in response to its requests.

**C.     Aetna Conducts a Second Review of Ms. Winkler's Claim and Denies Benefits Beyond March 31, 2005**.

On February 11, 2005, Lucie Sabina, **Aetna's** LTD benefits analyst, requested that a nurse review Ms. Winkler's claim, including the updated medical records that were received from Dr. Hamad. (AR at 114.) A nurse reviewer, Julie Ballas, reviewed Ms. Winkler's medical file, which included the clinical information from Dr. Elghazi from May 25, 2004 and records from a follow-up visit to Dr. Conrad on October 13, 2004.[2] (*Id*.) On February 17, 2005, Ms. Ballas made the following assessment:

> [M]edical supports [employee] has had no cardiac symptoms since her initial cardiac arrest in January '04. The short term memory impairment is per self report, no medical to support that [employee] is disabled from her usual pre-[myocardial

---

[1] The parties do not explain, nor does the Administrative Record show what was contained in these 56 pages of documents.

[2] The specific contents of the evidence that Ms. Winkler submitted in support of her claim is presented below.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

> infarction] activities due to cognitive problems. Employee's cardiologist was stating [he] supported a part time [return to work] as early as October '04.

(*Id*.) Aetna concluded that the records failed to support a functional impairment that prevented Ms. Winkler from performing her own occupation. (*Id*. at 287-299.) On April 1, 2005, Aetna sent Ms. Winkler written notification that it was denying her claim for disability benefits beyond March 31, 2005. (*Id*. at 302.) In the letter, Aetna explained:

> The medical information received supports you have had no cardiac symptoms since your initial cardiac arrest in January 2004. You have reported short term memory impairment, however no medical information has been provided to support you are disabled from your pre-[myocardial infarction] activities due to cognitive problems. Your cardiologist appears to have supported a part time return to work as early as October 2004. The medical information provided supports your ability to perform the material duties of your own occupation.

(*Id*.) In the letter, Aetna also informed Ms. Winkler that she was entitled to a review of the denial. The letter stated that Aetna would review any additional information that Ms. Winkler submitted regarding her condition, including but not limited to:

- a detailed narrative report for the period April 1, 2005 through the present outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;

- diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;

- any information specific to the condition(s) for which you are claiming total disability that would help us evaluate your disability status; and

- any other information or documentation you think may help in reviewing your claim.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

(*Id*. at 302-03.)

### D. Ms. Winkler Requests that Aetna Review its Denial of her Claim.

On June 13, 2005, Ms. Winkler notified Aetna that she was requesting a review of the denial of her claim. (AR at 305.) On June 27, 2005, Aenta acknowledged Ms. Winkler's intent to appeal and again provided examples of additional information that would be helpful on appeal. (*Id*. at 308.) On September 29, 2005 Aetna agreed to extend the time of Ms. Winkler's appeal by 30 days to enable her and her attorney to gather additional medical records to submit to Aenta for review. (*Id*. at 342.)

In support of her appeal, Ms. Winkler submitted the following additional information:

- A mental impairment questionnaire completed by Ms. Winkler's psychiatrist Dr. Jacob on October 11, 2005.

- Correspondence and a mental impairment questionnaire completed by Ms. Winkler's psychologist, Dr. Unruh on October 21, 2005.

- Correspondence from Ms. Winkler's internist Dr. Hamad on June 13, 2005 and a cardiac residual functional capacity questionnaire completed by Dr. Hamad on September 12, 2005.

(AR at 327-31.)

Aetna sent the file for physician review on November 1, 2005.[3]

### E. Aetna's Review of Ms. Winkler's Appeal

1. <u>Duties of National American Red Cross Donor Services Supervisor</u>

---

[3] Plaintiff submitted some of her supporting documentation past the November 1, 2005 deadline, although Aetna considered the late-submitted records in its review. (*See* AR at 342, 351, 359.)

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

Prior to evaluating Plaintiff's appeal, Aetna obtained from the National American Red Cross the job description of a Donor Services Supervisor to determine what duties Plaintiff was required to perform in her occupation. (*See* AR at 338 [Job Description for Donor Services Supervisor].) The description summarizes the duties of a Donor Services Supervisor as:

> Supervise one or more collection operation segments for mobile and fixed site allogeneic and specialized blood products . . . to ensure the achievement of annual goals in the most efficient and cost effective manner possible. Supervise implementation of staffing and deployment policies. Contribute to the analysis and remedy of efficiency issues. Provide training in all regulatory requirements and supervises operational staff.
>
> Perform all duties and responsibilities in compliance with standard operating procedures . . . and applicable [f]ederal, state, and local regulations.

(*Id*. at 338.) The job description lists a Donor Services Supervisor's major responsibilities as:

- Contribut[ing] to the development and implementation of annual operating plans to ensure achievement of area collection goals and organizational objectives.

- Contribut[ing] to the development of and monitor[ing] implementation of local operating procedures, quality control procedures and staff training protocols . . . and all other regulatory requirements.

- Assist[ing] with the evaluation and authorization of medical holds or deferrals and conduct[ing] follow-up investigations of error/accident reports, including staff retraining and counseling, to protect patient and donor safety.

- Perform[ing] periodic operational audits of assigned area to assess efficiency and effectiveness of current methods and improve productivity in support of organizational goals.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

- Supervis[ing] assigned staff in accordance with personnel policies and bargaining unit contracts, including evaluating performance, recommending disciplinary actions and providing appropriate input in hiring/firing decisions, to enhance the success of operations and minimize turnover.

(*Id.*) According to the job description, qualifications for the position include "excellent organizational skills, the ability to handle multiple priorities effectively, analyze problems, recommend appropriate solutions, and assimilate information quickly. Excellent interpersonal, verbal and written communications skills to deal with all levels of staff, hospital personnel, physicians, volunteers and donors." (*Id.* at 339.) The "essential functions" of the job include "operational flexibility . . . to meet sudden and unpredictable needs," and the ability to travel to sites throughout the region. (*Id.*)

       2.       <u>Aetna's Review of Ms. Winkler's Medical Records</u>

In evaluating Ms. Winkler's claim, Aetna considered the following records (*see* AR at 404-05):

<u>April 23, 2004</u>:[4] Letter from Dr. Conrad (cardiologist) reporting that Ms. Winkler had a myocardial infarction and cardiac arrest on 1/14/04, that the cardiac catheterization showed no occlusive coronary disease, that she had a defibrillator implanted but no stent placed, that she has a regular heart rate with no murmurs or gallops, that she is on various medications, and that her memory is improving. (AR at 232-33.)

<u>May 25, 2004</u>: Visit notes from Dr. Elghazi stating that Ms. Winkler has no recollection of the cardiac arrest, has no difficulty with long term memory, no problem driving and no problem with her financial affairs, no disorientation, no depression, a mental status score of "38/38 exam essentially negative." Dr. Elghazi's impression was that Ms. Winkler has "mild cognitive impairment, subjective," and recommended "neurological observation" and a re-evaluation of her cognitive functioning. (AR at 229-30.)

---

[4] The date refers to the date the document was prepared.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

October 13, 2004: Letter from Dr. Conrad to Dr. Hamad summarizing his visit with Ms. Winkler on that day. Dr. Conrad writes that Ms. Winkler "looks good and is feeling pretty well but claims to have a lot of stress both at home and work . . . I do not know what to tell her about work and stress. I think it would be good for her to consider some mentally challenging part time work and to be sure to get some exercise. I do hope she can quit smoking." (AR at 224-25.)

June 13, 2005: Letter from Dr. Hamad (internist) reporting that Dr. Hamad had seen Plaintiff on 4/12/05 and 6/9/05. Dr. Hamad writes that Ms. Winkler continues **to** experience chest pain, has difficulty sleeping, depression, and has "memory loss secondary to hypotension [low blood pressure]." Dr. Hamad also notes which medications Ms. Winkler was taking, and that she had a "L heart cath done in 2/2005 and lab data done in April 2005" and both were within normal limits. In the letter Dr. Hamad concluded that "due to her continuing chest pains, she is unable to be gainfully employed and therefore should be considered disabled." (AR at 326.)

September 12, 2005: "Cardiac residual functioning capacity questionnaire" completed by Dr. Hamad, in which Dr. Hamad checked boxes indicating that Ms. Winkler had chest pain, anginal equivalent pain and fatigue. Dr. Hamad states that Ms. Winkler is "incapable of even 'low stress' jobs," but the only reason provided is "No risk factor other than stress." (AR at 327-28.)

October 11, 2005: A mental impairment questionnaire completed by Dr. Jacob (psychiatrist), indicating that Ms. Winkler has been having deficiencies of concentration, that minimal increase in mental demands or change in the environment would cause her to deteriorate, that she has an inability to function outside a highly supportive living arrangement, and that her impairment or treatment for it would cause her to be absent from work for more than 4 days per month. (AR at 352-57.)

October 21, 2005: A mental impairment questionnaire completed by Dr. Unruh (psychologist) indicating limited functional capacity to perform a number of tasks. October 31, 2005: Letter from Dr. Unruh, in which he states that Ms. Winkler came to him for an initial assessment on August 19, 2005, and that he has seen her five times for outpatient therapy since then. In the letter, Dr. Unruh states that Ms.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

Winkler has a diagnosis of major depression, and that when Ms. Winkler "thinks of returning to work she becomes overwhelmingly anxious, suffers severe panic–takes nitroglycerine tablets because she becomes fearful of having another heart attack." (AR at 352-57.)

In the mental impairment questionnaires, Dr. Jacob and Dr. Unruh both indicated that Plaintiff would not be able to meet competitive standards in the following areas:

- Complete a normal workday or workweek without interruptions from psychologically based symptoms;

- Deal with normal work stress or deal with stress of semiskilled or skilled work; and

- Understand and remember detailed instructions; and remember worklike procedures.

(*See* AR at 322-25 [Dr. Jacob] and 354-57 [Dr. Unruh].) Drs. Jacobs and Unruh each indicated Plaintiff was "seriously limited but not precluded" in her ability to function in other areas. For example, Dr. Unruh indicated that Plaintiff was "seriously limited but not precluded" in:

- understanding and remembering very short and simple instructions
- making simple work-related decisions, responding appropriately to changes in a routine work setting
- being aware of normal hazards and taking appropriate precautions
- interacting appropriately with the general public. (AR at 356.)

Dr. Jacobs indicated that Plaintiff was seriously limited but not precluded from:

- maintaining attention for a two hour segment
- maintaining regular attendance
- sustaining an ordinary routine without special supervision
- working in coordination with or proximity of others without being unduly distracted

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

- making simple work-related decision
- responding appropriately to changes in a routine work setting.

(AR at 323.) Dr. Jacob also noted that Plaintiff had "limited but satisfactory" capacity to carry out very short and simple instructions, interact appropriately with the general public, travel in unfamiliar places, and use public transportation. (*Id.* at 323-24.) Dr. Jacob noted that she had "unlimited or very good" capacity to understand and remember very short and simple instructions, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, and to adhere to basic standards of neatness and cleanliness. (*Id.*)

  The triage noted the mental impairment questionnaires in their review, but also noted the lack of documentation regarding visits to the doctors as well as any mention of Ms. Winkler's response to treatment. With respect to the conclusion reached by Dr. Jacob, the review states: "the file lacks visit notes from this specialist, his assessment and treatment to support physical / psychological functional capacity impairment from gainful employment." (*Id.*) With respect to Dr. Unruh's assessment, the review states: "there is no mention of notes from [Dr. Unruh] available for review to assess claimant's response to treatment. There is no mention of emergency room visits." (*Id.*) The review concludes that "[b]ased on the medical/behavioral health information the documentation does not support a physical/psychiatric functional capacity impairment preventing the claimant from performing in a light level work activity from 4/1/05 forward." (*Id.*)

  On November 22, 2005, Aetna sent Judith Leland (Ms. Winkler's attorney) a letter informing her that Aetna was upholding the decision to deny Ms. Winkler's claim for LTD benefits beyond April 1, 2005. (AR at 418-420.) The letter, written by Aetna Senior Technical Specialist Donna Kirby, outlined the reasons for the decision. Ms. Kirby provided a summary of the records that Aetna reviewed in reaching its decision, and explained that although "Ms. Winkler's medical records indicated that she was fearful of returning to work due to the level of stress there. . . . medically the records did not show continued problems relating to her cardiac condition and her psychiatric impairment was not in itself severe where it would warrant restrictions and limitations from working." (*Id.* at 420.)

  On December 16, 2008, Plaintiff filed an appeal of Aetna's denial of her claim for

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

long-term disability benefits in this Court.

## II.   LEGAL STANDARDS OF REVIEW

### A.   The Standard of Review is Abuse of Discretion.

The parties agree that abuse of discretion is the proper standard of review the Court must apply in reviewing Aetna's denial of long term disability benefits, since the Plan provides decision-making discretion to the Administrator. *See Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th Cir. 2008) ("When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable."). Under an abuse of discretion review, the court must affirm an administrator's decision to terminate benefits if the decision was "based upon a reasonable interpretation of the plan's terms and made in good faith." *Bendixen v. Standard Life Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle N.F.L. Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

### B.   There is no Structural Conflict of Interest.

A "structural conflict of interest" arises where an insurer "acts as both the plan administrator and the funding source for benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006). Where a structural conflict of interest exists, a court is to apply an abuse of discretion review that is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." *Id*. at 967. In other words, the court applies an abuse of discretion review, but one that is "tempered by skepticism commensurate with the plan administrator's conflict of interest." *Id*. at 968.

On September 10, 2009, this Court denied Ms. Winkler's request that it consider evidence outside of the administrative record because she failed to identify a predicate

O

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

conflict of interest that would warrant doing so. The Court noted that Ms. Winkler did not address the issue of who funds the Plan or point to any other conflict of interest that would warrant a heightened degree of scrutiny. In her opening brief, Ms. Winkler acknowledges that her former employer—the National American Red Cross—does not act as both the plan administrator and funding source for benefits. (Pl. Br. at 23.) Rather, the plan is funded by the American National Red Cross and administered by Aetna. (*Id.*) Accordingly, there is no structural conflict of interest that would warrant heightened scrutiny under an abuse of discretion standard. *Cf. Metropolitan Life Ins. Co. v. Glenn,* 128 S.Ct. 2343 (2008) (conflict of interest exists where insurance company acts as plan administrator and both evaluates and pays claims.)

### C. Plaintiff has not Described any Procedural Irregularities that the Court Must Weigh in Reviewing for Abuse of Discretion.

In its September 10, 2009 ruling, the Court noted that Plaintiff had alleged facts that could arguably be characterized as "procedural irregularities" that might lead the Court to weigh a conflict of interest more heavily when reviewing for abuse of discretion. Therefore, the Court permitted Ms. Winkler to file a request "that the Court consider evidence of procedural irregularities, if she wishes to do so. Such a request must identify with specificity the irregularities, and explain why they contravene ERISA or the Plan under governing authorities."

"A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 972 (9th Cir. 2006). By contrast, "[w]hen an administrator can show that it has engaged in an "'ongoing, good faith exchange of information between the administrator and the claimant,'" the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (quoting *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003)).

Ms. Winkler did not file a separate request that the Court consider evidence of procedural irregularities, but argues in her opening brief that the Court should weigh heavily those procedural irregularities that she identified in her Conflict of Interest Brief. Specifically, Ms. Winkler alleges the following procedural irregularities: (1) Aetna's

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

failure to engage in a meaningful dialogue with Ms. Winkler; (2) Aetna's failure to adequately investigate Ms. Winkler's claim; and (3) Aetna's failure to credit reliable evidence. As explained below, Plaintiff has not demonstrated that these irregularities contravene ERISA or the Plan such that a heightened degree of review is warranted in examining Aetna's decision to deny benefits.

The first procedural irregularity alleged by Plaintiff is Aetna's failure to ask Dr. Conrad and Dr. Hamad specifically for their chart notes, treatment records, or medical records when it wrote to them on January 21, 2005. (Pl's Br. at 25.) However, Plaintiff does not explain how this was a deviation from standard claims-handling practices. When Aetna conducted an initial telephonic interview with Ms. Winkler in October 2004, she revealed that she had three treating physicians and planned to undergo further evaluation at USC, and that her current restrictions prohibiting her from performing her job were memory loss and cardiac problems. Accordingly, it was not unreasonable for Aetna to request only the documents it identified in its letters to Drs. Conrad and Hamad. Moreover, when Aetna denied Plaintiff's claim for benefits on April 1, 2005, it informed her of specific information that would assist it in evaluating her claim. On June 26, 2005, Aetna acknowledged Plaintiff's intent to appeal and again provided examples of additional information that would be helpful on appeal. (AR at 307-308.) After being informed that Plaintiff was being represented by an attorney, Aetna mailed the attorney copies of relevant documents and records relating to Plaintiff's claim. (*Id*. at 311.) Additionally, Aetna agreed to extend the time on Plaintiff's appeal so that her attorney could gather additional medical records to submit for review, and followed up with Plaintiff's attorney to ask whether additional medical information would be submitted on appeal. (*Id*. at 313.) Accordingly, Plaintiff has not provided evidence that there was not an "ongoing, good faith exchange of information" between her and Aetna.

Second, Plaintiff argues that Aetna's selectively choosing language from Dr. Conrad's medical report to deny her benefits constitutes a procedural irregularity that warrants heightened review. Specifically, she argues that in its April 1, 2005 denial letter, Aetna stated: "Your cardiologist appears to have supported a part time return to work as early as October 2004." (AR at 302.) However, contrary to Plaintiff's characterization of Aetna's reasons for its denial, Aetna did not exclusively rely on Dr. Conrad's comment, nor did Aetna appear to take Dr. Conrad's notes out of context to reach its conclusion that Plaintiff's medical records supported a finding that she could

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

return to work. Rather, the administrative record (as well as Aetna's April 1, 2005 denial letter) indicates that she had no cardiac symptoms following her initial cardiac arrest in January 2004, and that there was no objective medical information in her file to support a finding that Plaintiff was disabled due to cognitive problems.

Finally, Plaintiff argues that Aetna disregarded and failed to credit the opinions, symptoms reported, and documentation provided in the medical records and questionnaires of Drs. Hamad, Jacob, and Unruh. Plaintiff argues that despite the documentation provided by these doctors, which indicated that Plaintiff had cognitive functioning problems that precluded her from performing her job duties, Aetna "never analyzed Mrs. Winkler's position from anything other than an exertional standpoint." (Pl. Br. at 28.) What Plaintiff describes, however is not a procedural irregularity; rather, it is an argument that goes to the substance of Aetna's review, which the Court will consider in its analysis below.

## III. DISCUSSION

Plaintiff argues that Aetna abused its discretion by concluding that she was not disabled at the time Aetna denied her claim for LTD benefits. She argues that contrary to Aetna's determination, the medical evidence that Aetna reviewed supported both continued cardiac problems and a cognitive and psychiatric condition that were severe enough to preclude her from returning to work. Specifically, Plaintiff points to Dr. Hamad's medical records documenting Ms. Winkler's chest pain at the time of denial, (AR at 326-329) and documentation from Drs. Jacobs and Unruh of Ms. Winkler's inability to deal with normal work stress or remember information that she needed for work. (*Id*. at 322-25 and 354-57.) While the Court agrees that the medical records of Drs. Hamad, Jacobs, and Unruh could support a finding that Ms. Winkler was unable to return to work as a result of her condition, there is no evidence that Aetna ignored or arbitrarily discredited these findings. To the contrary, as explained below, Aetna reviewed the medical records of Drs. Hamad, Jacobs, and Unruh and came to a decision contrary to the assessments made by these doctors based on (1) the fact that their records from lacked specific notes or follow-up, and (2) on other medical evidence in Ms. Winkler's file that contradicted the opinions of these doctors.

**A.      Aetna Did not Abuse its Discretion in Finding that Plaintiff's Cardiac**

Case 2:08-cv-08269-AHM-CW   Document 24   Filed 05/03/10   Page 15 of 18   Page ID #:196

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

**Conditions did not Preclude her from Returning to Work.**

Ms. Winkler's medical records regarding her cardiac conditions include the following:

- February 23, 2004 - letter from Dr. Conrad, who reported that on 1/14/04 Plaintiff had a myocardial infarction and cardiac arrest, and that the cardiac catheterization showed no occlusive coronary disease.

- October 13, 2004 - letter from Dr. Conrad in which he reported that Plaintiff looked good and was feeling well but claimed to have a lot of stress at home and work, and that he recommended she consider "some mentally challenging part time work" and that she get some exercise and stop smoking. (*Id*. at 402-04.)

- On June 13, 2005 - Dr. Hamad reported that Ms. Winkler had continued chest pain and as a result was "unable to be gainfully employed." However, the results of diagnostic testing done on her heart in February and April 2005 were within normal limits. (*Id*. at 403.)

- On September 12, 2005 - Dr. Hamad "completed a cardiac residual functional capacity, stating that the claimant has no risk factor other than stress, incapable of even low stress job." (*Id.*)

The reviewers also observed that there is "no mention of hospital admit, [or] visits to the emergency room." (*Id*. at 404.) At the triage roundtable review of Ms. Winkler's claim, Dr. Anfield and registered nurse Maria Angelillo reviewed these records, and concluded that this documentation does not support a physical functional capacity impairment that would prevent her from returning to work.

Plaintiff, in the present appeal, argues Dr. Hamad's medical records from September 12, 2005 documented the following findings that should have led to a conclusion that Plaintiff was disabled:

- Plaintiff had a stress myocardial infraction in January 2004;

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

- Plaintiff had substernal chest pain which radiated to her jaw and shoulders;
- Plaintiff had chest pain, anginal equivalent pain;
- Plaintiff had an implanted pacemaker;
- Dr. Hamad noted Plaintiff was to have a "no stress job"; and
- Plaintiff was taking medication for blood pressure, chest pain and other heart-related indications.

Plaintiff is correct that this evidence does support a finding that Ms. Winkler was continuing to have chest pains that would preclude her from returning to work. However, other evidence supports a finding to the contrary. For example, Dr. Hamad also noted that in February of 2005 Ms. Winkler had a "hearth cath" and lab work done, and "both were normal." (*Id*. at 404.) Thus, the fact that Aetna chose not to credit some of Dr. Hamad's findings (and her ultimate recommendation) does not amount to an abuse of discretion.

    **B.**    **Aetna Did not Abuse its Discretion in Finding that Plaintiff's Mental Status did not Preclude her from Returning to Work.**

In their review, Dr. Anfield and Ms. Angelillo noted the following from Plaintiff's medical records (described more fully above):

- On May 25, 2004 Dr. Elghazi noted that Ms. Winkler had a "mental status score" of "38/38," normal judgment and insight, and negative results on a CT scan of her head, and diagnosed her with "mild cognitive impairment, subjective." (AR at 403.)

- A mental impairment questionnaire completed on August 19, 2005 by Dr. Unruh (psychologist), and a letter from Dr. Unruh on October 31, 2005 stating that when Plaintiff thinks of returning to work she becomes overwhelmingly anxious and suffers severe panic. (*See* AR at 352-53.)

- A mental impairment questionnaire completed on October 11, 2005 by Dr. Jacob (psychiatrist) indicating that even a minimal increase in mental demands or change in environment could cause her to "decompensate." (*See* AR at 361-66.)

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

Plaintiff argues that both Dr. Jacob and Dr. Unruh provided documentation that indicated that she would be precluded from performing her job, and that therefore Aetna abused its discretion by concluding that the medical records did not document that her "psychiatric impairment was not in itself severe where it would warrant restrictions and limitations from working." (AR at 420.) The Court agrees that there was substantial evidence from Plaintiff's medical records that *could* have supported a finding that she was unable to return to work as a result of stress. However, under the deferential abuse of discretion standard, the contrary decision reached by Aetna was not unreasonable or without any factual support, as explained below.

In evaluating Plaintiff's appeal of her claim, the reviewers at Aetna commented on the findings the mental impairment questionnaire forms that were completed by Drs. Jacobs and Unruh, but apparently gave less weight to their conclusions because there were no visit notes from these doctors that would enable a review of their assessments or of Ms. Winkler's response to treatment. (*Id.* at 404.) Documentation of Plaintiff's "response to treatment" was among the information that Aetna sought from Plaintiff in its letter denying her benefits claim from April 1, 2005 forward. Thus, Plaintiff was fairly warned of the importance of such information, and her failure to provide it was not the result of a lack of communication on Aetna's part. Nor does Plaintiff allege that she had and was prepared to submit such documentation. Accordingly, it was not an abuse of discretion for Aetna to afford less weight to the opinions of Dr. Jacob and Dr. Unruh.

Additionally, other evidence in Ms. Winkler's medical records cast doubt on the ultimate conclusions reached by Drs. Unruh, Jacob, and Hamad that Plaintiff could not return to work because of stress. Dr. Elghazi had found no evidence of cognitive impairment aside from what Plaintiff self-reported. Dr. Conrad had stated that Plaintiff seemed to be recovering and suggested that she try some mentally challenging part time work as early as October 2004. Additionally, the mental health questionnaires themselves indicated that Plaintiff had the ability to perform a number of work-related duties, including maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, maintaining an awareness of normal hazards and taking appropriate precautions, and traveling in unfamiliar places. Although the questionnaires indicated that Plaintiff was "seriously limited but not precluded" from performing the majority of functions that the questionnaires surveyed, there were only a few items for which the doctors felt Plaintiff was "unable to meet competitive standards" or "had no

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-8269 AHM (CWx) | Date | May 3, 2010 |
|---|---|---|---|
| Title | MARTHA WINKLER v. AETNA LIFE INSURANCE COMPANY, *et al.* | | |

useful ability to function." (*See* AR at 323-24 and 356-57.)

## IV.   CONCLUSION

    For the foregoing reasons, the Court finds that Defendants did not abuse their discretion in denying Plaintiff's claim for long-term disability benefits.

**JS-6**

|  | : |
|---|---|
| Initials of Preparer | SMO |